NMA:EAG/AL
F.#2011R02065

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M 12-005**

- - - - - - - - - - - - - X

**To Be Filed Under Seal**

UNITED STATES OF AMERICA

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANTS

        -against-

THOMAS FARESE and
PAT TRUGLIA,

(T. 18, U.S.C., §§
 1956(a)(3)(B) and 2)

                Defendants.

- - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        SCOTT CURTIS, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation,
duly appointed according to law and acting as such.

        Upon information and belief, in or about and between
November 2011 and January 2012, both dates being approximate and
inclusive, within the Eastern District of New York and elsewhere,
the defendants THOMAS FARESE and PAT TRUGLIA, together with
others, did knowingly and intentionally conduct and attempt to
conduct one or more financial transactions affecting interstate
commerce, to wit: a transaction involving a personal check in the
amount of $40,000, which transactions involved property
represented to be the proceeds of specified unlawful activity, to
wit: proceeds from a loansharking business, contrary to Title 18,
United States Code, Sections 892(a), 894(a) and 2, knowing that
the property involved in the transactions were represented to be

the proceeds of specified unlawful activity, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(3)(B), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 1996.  During my tenure with FBI, I have been involved in various criminal investigations of organized crime.  These investigations have utilized, among other investigative techniques, the use of physical and electronic surveillance, execution of search warrants, consensual recordings and debriefing of confidential sources.  Through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving different forms of illegal gambling, loansharking and extortion, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.  I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) information obtained from one or more cooperating witnesses, (c) information obtained

2

from other law enforcement agents, and (d) recordings made by one or more cooperating witnesses. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrests.

## THE COLOMBO ORGANIZED CRIME FAMILY

3. At all times pertinent to this complaint, the members and associates of the Colombo organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereinafter, the "Colombo crime family" and the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Colombo crime family engaged in, and its activities affected, interstate and foreign commerce. The Colombo crime family was an organized criminal group that operated in the Eastern District of New York and elsewhere.

3

4.    La Cosa Nostra operated through organized crime families.  Five of these crime families – the Bonanno, Colombo, Gambino, Genovese and Luchese crime families – were headquartered in New York City and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries.  Another crime family, the Decavalcante crime family, operated principally in New Jersey, but from time to time also in New York City.

5.    The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families.  The Commission convened from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

6.    The Colombo crime family had a hierarchy and structure.  The head of the Colombo crime family was known as the "boss."  The Colombo crime family boss was assisted by an "underboss" and a counselor known as a "consigliere."  Together, the boss, underboss and consigliere were the crime family's "administration."  With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups.  The administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family.

4

In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family. Members of the Colombo crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another administration member from law enforcement scrutiny. Further, on occasion, the Colombo crime family was overseen by a "panel" of crime family members that did not include the boss, underboss and/or consigliere.

7. Below the administration of the Colombo crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

8. Only members of the Colombo crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been "straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who

nonetheless engaged in criminal activity for, and under the
protection of, the crime family.

        9.   Many requirements existed before an associate
could become a member of the Colombo crime family.   The
Commission of La Cosa Nostra from time to time limited the number
of new members that could be added to a crime family.   An
associate was also required to be proposed for membership by an
existing crime family member.   When the crime family's
administration considered the associate worthy of membership, the
administration then circulated the proposed associate's name on a
list given to other La Cosa Nostra crime families, which the
other crime families reviewed and either approved or disapproved.
Unless there was an objection to the associate's membership, the
crime family then "inducted," or "straightened out," the
associate as a member of the crime family in a secret ceremony.
During the ceremony, the associate, among other things: swore
allegiance for life to the crime family above all else, even the
associate's own family; swore, on penalty of death, never to
reveal the crime family's existence, criminal activities and
other secrets; and swore to follow all orders issued by the crime
family boss, including swearing to commit murder if the boss
directed it.

## Methods and Means of the Enterprise

10.    The principal purpose of the Colombo crime family was to generate money for its members and associates.  This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, illegal gambling and loansharking.  The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

11.    Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family.  For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

12.    The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities.  That conduct included a commitment to murdering persons, particularly members or

7

associates of the crime families, who were perceived as potential witnesses against members and associates of the enterprise.

13.   Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

## THE DEFENDANTS

14.   At various times relevant to this Complaint, the defendant THOMAS FARESE was an inducted member of the Colombo crime family.  In or about 1996, FARESE was arraigned on an indictment in the United States District Court for the Southern District of Florida charging, among other crimes, racketeering conspiracy and money laundering conspiracy.  In the indictment, FARESE was alleged to be a captain in the Colombo crime family. FARESE was thereafter convicted of racketeering conspiracy and was sentenced to 87 months' incarceration.  FARESE was released on or about March 22, 2005.

15.   On November 14, 2011, a cooperating witness (the "CW"),[1] who was an inducted member of the Colombo crime family, met with the defendant THOMAS FARESE in Margate, Florida.  The

---

[1]     The CW has pled guilty, pursuant to a plea agreement with the United States Attorney's Office for the Eastern District of New York, to racketeering conspiracy, including fraud as a predicate racketeering act.  In exchange for his cooperation, the CW is hoping to receive leniency at sentencing and possible admission into the Witness Security program.  The information provided by CW regarding La Cosa Nostra activities in New York and Florida has been corroborated in numerous ways, including by information from other confidential sources, cooperating witnesses, consensual recordings and other physical evidence.

8

meeting was consensually recorded by the CW, who was wearing a recording device during the meeting. During the recorded conversation, the defendant THOMAS FARESE said, "When I was a skipper before, Allie took me down. But he took my place. Allie didn't love me."[2] Based on my training, experience and knowledge of this investigation, there is probable cause to believe that "Allie" is a reference to Alphonse "Allie Boy" Persico, who has long been the acting boss of the Colombo crime family and who is currently serving a life term of imprisonment, and that the defendant THOMAS FARESE's reference to the time that he was a "skipper" was a reference to the time period that the defendant THOMAS FARESE held the position of captain in the Colombo family.

16.    The CW has advised that prior to the November 14, 2011 conversation, the CW was demoted from his position as a captain in the Colombo crime family and that the defendant THOMAS FARESE was elevated to the position of consigliere. The CW has further advised that, as of November 2011, the CW reported to the defendant THOMAS FARESE. A review of the November 14, 2011 recording corroborates the information provided by the CW.

17.    During the November 14, 2011 recorded conversation between the defendant THOMAS FARESE and the CW, the defendant THOMAS FARESE advised the CW that "Andrew wants me in a position." The CW has advised that the CW understood the

---

[2]    The quoted excerpts provided herein are based on draft transcripts and are subject to revision.

defendant THOMAS FARESE's reference to "Andrew" to be a reference to "Andrew Russo," who held the position of street boss of the Colombo crime family as of his arrest and incarceration in January 2011. The CW has further advised that the CW understood the defendant THOMAS FARESE's reference to "a position" to be a reference to a position on the Colombo crime family administration. The following is a transcript of a subsequent excerpt of the November 14, 2011 consensually recorded conversation:

> TF: It's hard to talk to Andrew because - unless you're in there [a reference to the Metropolitan Detention Center in Brooklyn, New York (the "Brooklyn MDC"), where Andrew Russo is currently incarcerated] - because I wouldn't send someone in there to -

> CW: No.

> TF: Ask him any questions. They [UI] -

> CW: No, no you can't. No you can't.

> TF: What I did was, what I wind up, wind up. Call his family, he said, tell him that a close friend of Tommy's or whoever is coming in to say hello to him. Said, "Okay." The lawyer asked him one, first of all, the lawyer's involved in that entertainment business so he got along good with Andrew.

> CW: Um hum. Um hum. Right.

> TF: But he asked him one question. I'm only here to ask you one question if I may. Tommy got a message, he wants to know if the message came from you. Yes or no, I don't want to know, don't tell me anything else. Andrew said, "Yes."

> CW: Good.

10

TF:   And that was that.

The CW has advised that the CW understood the defendant THOMAS
FARESE's statements to mean that the defendant had a lawyer meet
with Andrew Russo at the Brooklyn MDC to confirm that Russo – as
opposed to someone else – had sent the message to the defendant
THOMAS FARESE that the defendant should assume a position on the
Colombo family administration, and that Russo had confirmed that
he was the originator of the message to the defendant THOMAS
FARESE.

18.   A review of records from the Brooklyn MDC
revealed that a Florida-based lawyer – not the lawyer
representing Andrew Russo in his pending case (see United States
v. Andrew Russo, Criminal Docket No. 11-30 (KAM)) – visited
Andrew Russo on October 13, 2011 for approximately eight minutes.

19.   According to the CW, the defendant PAT TRUGLIA is
an associate of the Colombo crime family.

### MONEY LAUNDERING SCHEME

20.   As described herein, there is probable cause to
believe that the defendants THOMAS FARESE and PAT TRUGLIA
laundered $40,000, which purportedly represented proceeds of a
loansharking business belonging to the CW.

21.   On or about November 15, 2011, the CW met with
the defendant PAT TRUGLIA and others in Coconut Creek, Florida.
Although the CW was equipped with a recording device, the device

malfunctioned and the meeting was not recorded. CW has advised that during the meeting the CW stated, in sum and substance and in part, that he needed to "wash" the proceeds of his loansharking business and that the defendant PAT TRUGLIA volunteered to do it for the CW.

    22. On or about November 16, 2011, the CW met with the defendant THOMAS FARESE and a coconspirator ("CC1") in Deerfield Beach, Florida. The meeting was consensually recorded by the CW, who was wearing a recording device during the meeting. The following is a transcript of an excerpt of that consensually recorded conversation:

> CW: Don't go too far. I got my briefcase in the car over there.
>
> TF: So what's up?
>
> CW: I got, I got, I got 40,000 in my briefcase, that I got from Dennis [another coconspirator of CW and the defendant THOMAS FARESE], from my business money, from shylocking. And I wanna give it to Patsy [the defendant PAT TRUGLIA]. He's gonna put it in an account, clean it up for me. Send me a check to Staten Island for the, you know what I mean?
>
> TF: Um hum. Um hum.
>
> CW: So I could pay lawyers and securities and stuff like that. <u>But I wanted you to know that I'm gonna do this so he knows, you know what I mean?</u>
>
> TF: <u>Yeah.</u>
>
> CW: Okay. <u>This way, everybody is aware of everything. You know?</u> I didn't want to ask you to do it. I didn't want to uh, you know what I mean?

12

TF: <u>He knows what he's doing?</u>

CW: What the fuck he's gotta do. He's gotta put it in. I told him, don't put it in all at once. Take it easy. I said, you got from now, I need the check December 1st. You know because then I made commitments, you know? Fuckin' Dennis, you know. Don't go too far, [first name of CC1] - because I don't want to leave that bag just sitting there.

CC1: I know, I. You told me that.

TF: I don't blame you.

CC1: I'll go up, turn around.

CW: Takes a fuckin' second, you know.

TF: Alright. <u>You mentioned to him that I know about it, right?</u>

CW: <u>No, I'm gonna mention it to him tonight but I wanted to talk to you first.</u>

TF: <u>Right. That's cool.</u>

CW: If you told me don't mention it to him, then I won't.

TF: It's better to let him know in case he gets any--

CW: Exactly. Exactly.

TF: Okay. That's cool. I think that's alright.

Based on my training, experience and knowledge of this investigation, it is common for members and associates of organized crime families to seek the approval of a high-ranking member of a crime family before committing a crime, a process often referred to as putting a crime "on record" with the high-ranking member. One reason for putting a crime "on record" is so

13

that if a dispute arises, the high-ranking member will be in a position to resolve the dispute. Therefore, there is probable cause to believe that when the CW said, "I wanted you to know that I'm gonna do this so he knows, you know what I mean?" the CW was indicating that he wanted the defendant THOMAS FARESE, a high-ranking member of the Colombo crime family, to approve of the proposed money laundering transaction and wanted the defendant PAT TRUGLIA, referred to as "him," to understand that the defendant approved of that transaction. In addition, there is probable cause to believe that when the defendant THOMAS FARESE asked, "You mentioned to him that I know about it, right?" the defendant THOMAS FARESE was conveying to the CW that, in the defendant THOMAS FARESE's role as a high-ranking member of the Colombo crime family and the CW's superior, the defendant THOMAS FARESE authorized the proposed money laundering transaction and the defendant PAT TRUGLIA's role in that transaction, and was asking the CW if the CW had so advised the defendant PAT TRUGLIA. Finally, there is probable cause to believe that when the CW said, "No, I'm gonna mention it to him tonight but I wanted to talk to you first" and the defendant THOMAS FARESE responded, "Right. That's cool," the defendant THOMAS FARESE was agreeing that the CW would tell the defendant PAT TRUGLIA that the defendant THOMAS FARESE in fact approved of the proposed money laundering transaction.

23.   Later that day, the CW met with the defendant PAT TRUGLIA in Pompano Beach, Florida.  As described in paragraph 21, the defendant PAT TRUGLIA had previously agreed to launder the purported proceeds of the CW's loansharking operation.  The November 16, 2011 meeting between the CW and the defendant PAT TRUGLIA was consensually recorded by the CW, who was wearing a recording device during the meeting.  Following is an excerpt of that consensually recorded conversation.

CW:  What's doing, kid?

PT:  Alright, alright.

CW:  How do you feel?

PT:  Busy.  Running around crazy.

CW:  [Chuckles]

PT:  Running around crazy.

CW:  Good to see you.

PT:  What's going on?

CW:  Nothing.  I wanna do this 'cause I got an appointment, I gotta take care of this.  Listen, I spoke to, I was with Tommy [a reference to the defendant THOMAS FARESE].

PT:  Okay.

CW:  Alright.  He knows I'm doing this with you, so.

PT:  Okay, great.  Listen, um, you want me to give you, uh, I'll sign a whole bunch of checks for you?

CW:  No, no, no.

PT:  Okay.  Okay.  I'm just saying you could take it out when you want to take it out.  Okay.  Okay.

CW: [UI] fine.  What I want to do is, um, what I want to do is, you got a put it in like 8,000.

PT: Yeah, yes.

CW: You can't, you know.

PT: Yeah.  I gotcha.

CW: Every deposit's gotta be 8,000.

PT: Yeah, sometimes I put in 4,000, sometimes I put in 5, sometimes I put in 2.

CW: But you know, it, it's gotta be the 40,000 here.

PT: Correct.

CW: It's gotta be by December 1st.  I gotta have the check.

PT: Okay.

CW: So you know.  So you know what I'm doing.

PT: Okay.

CW: Today's the 15th.

PT: Are you coming back on the first?

CW: No.

PT: Okay.

CW: No.

PT: Do you want me to give you checks tomorrow?

CW: No, we're gonna mail the check up, um.

PT: Whatever.  You just let me know.  Do I make out one check?  Or do I make out multiple?

CW: You can make out one check.  You can make out one check.

PT: Okay.

CW:   As long as that money's in the bank.

PT:   Yeah.

CW:   'Cause what I'm gonna do is we'll legitimize it.
      I'm gonna take it out and I'll write a check again
      for something.  Whatever you do, don't juggle the
      money.

PT:   No.  I got 12,000 in there now.

CW:   Don't.

PT:   You don't have to ask me that.

CW:   Tommy [the defendant THOMAS FARESE] will go
      fuckin' crazy.

PT:   You don't have to ask me that.  [nickname for CW],
      you know that.

CW:   He says, "[nickname for CW]."  I says, "listen, I
      trust Patsy [the defendant PAT TRUGLIA]."

PT:   Absolutely.  You don't have to ask me that.  We're
      good.

CW:   Okay.  I don't know.  I might be getting [UI].

PT:   Whatever you need.

     24.   On or about November 30, 2011, at approximately

4:38 p.m., the defendant PAT TRUGLIA placed a telephone call to

the CW.  The telephone call was consensually recorded by the CW.

During the recorded telephone call, the CW provided the defendant

PAT TRUGLIA with an address in Staten Island and the spelling of

the CW's first and last names.  The defendant PAT TRUGLIA asked

CW whether he "should make it like three of them?" to which the

CW responded in the negative, explaining that the CW "was just

going to deposit it, that's all."  The defendant PAT TRUGLIA then

agreed to send "this" by Federal Express the following day.

25.   On or about December 2, 2011, the CW provided to agents of the FBI a Federal Express envelope addressed to the CW's residence in Staten Island, New York, containing a check in the amount of $40,000.  The check inside the envelope was drawn from an account in the name of the defendant PAT TRUGLIA and was made out to the CW.  The CW advised that the CW had received the envelope and its contents on or about the morning of December 2, 2011.

26.   On or about December 2, 2011, at approximately 5:54 p.m., the defendant PAT TRUGLIA placed a 30-second call to the CW.  The telephone call was consensually recorded.  During the recorded telephone call, the defendant PAT TRUGLIA asked, "Listen, did, uh, did, um, everything okay today?  Did it come?" The CW responded that "everything was good."

27.   On or about December 11, 2011, the CW met with the defendant PAT TRUGLIA in Pompano Beach, Florida.  The meeting between the CW and the defendant PAT TRUGLIA was consensually recorded by the CW, who was wearing a recording device during the meeting.  During the recorded meeting, the CW and the defendant PAT TRUGLIA discussed the $40,000 check sent by the defendant PAT TRUGLIA, and the CW asked the defendant PAT TRUGLIA to "clean" another $8,500 of purported proceeds from the CW's loansharking business and the defendant PAT TRUGLIA readily agreed.  Following

18

is an excerpt of that consensually-recorded conversation.

        CW:  What are you doing tomorrow?

        PT:  Whatever you want me to do.

        CW:  Alright, um, I got - later, a guy's going to bring me 8,500 dollars.

        PT:  Okay.

        CW:  I gotta clean that up.  Same as we did the last time.

        PT:  Okay.  No problem.

        CW:  Take all the shylock money and cleaning it up.

        PT:  That's fine.  Whatever you want, I'm here. Whatever we need.  Listen, um, I never asked you, what if anybody, if anybody ever came to me and asked [UI].  Anybody.

        CW:  Like what?

        PT:  I have no clue.

        CW:  Like what?

        PT:  I have no clue.  What would I say?

        CW:  I have no clue.

        PT:  Why are you sending, why are you sending this man checks for?  I'm just wondering.

        CW:  Lending him money.

        PT:  Okay.

      28.   On or about December 11, 2011, the CW met with the defendant THOMAS FARESE in Delray Beach, Florida.  The meeting was consensually recorded by the CW, who was wearing a recording device during the meeting.  The following is a

transcript of an excerpt of that consensually recorded conversation:

>    TF:   The kid did your thing with the scratch, okay? Your, the, uh, Patsy [the defendant PAT TRUGLIA] and--
>
>    CW:   Yeah, he did a good job, Patsy. Yes he did. Yes, he did. Yes he did. As a matter of fact, I gotta pay a, I have to pay a whaddayacallit bill. Security bill. I gotta give them 9500. So--
>
>    TF:   For up there?
>
>    CW:   [UI] broke my fucking ass, boy. So I gotta give him, I'm gonna give him something a little later to do for me again. He's a good kid. But we could do it local before I go. I'm here till Tuesday night, so--.
>
>    TF:   Alright. If anything happens, we'll see each other again if we have to.

29.    In light of the information provided by the CW and the consensual recordings, there is probable cause to believe that the defendants THOMAS FARESE and PAT TRUGLIA did knowingly and intentionally conduct and attempt to conduct one or more financial transactions affecting interstate commerce, to wit: a transaction involving a personal check in the amount of $40,000, which transactions involved property represented to be the proceeds of specified unlawful activity, to wit: proceeds from a loansharking business, contrary to Title 18, United States Code, Sections 892(a), 894(a) and 2, knowing that the property involved in the transactions were represented to be the proceeds of specified unlawful activity, with the intent to conceal and

20

disguise the nature, location, source, ownership and control of property believed to be the proceeds of specified unlawful activity.

30.     Because public filing of this document could result in a risk of flight by the defendants, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrants be filed under seal.

WHEREFORE, your deponent respectfully requests that an arrest warrants be issued for the defendants THOMAS FARESE and PAT TRUGLIA so that they may be dealt with according to law.

Dated:     Brooklyn, New York
           January 3, 2012

_____
SCOTT CURTIS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of January, 2012

_____     S/Pohorelsky           LSKY

THE HONORA
UNITED STA
EASTERN DI