

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EAG/NS

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 16, 2014

By Hand and ECF

The Honorable Frederic Block
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>     Re:   United States v. Pat Truglia
>           Criminal Docket No. 12-0094

Dear Judge Block:

      The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, which is scheduled for June 18, 2014.  For the reasons set forth below, the government respectfully asks the Court to sentence the defendant within the advisory Guidelines range determined by the Court.

BACKGROUND

I.    The Offense Conduct

      In mid-November 2011, at the direction and with the approval of agents of the Federal Bureau of Investigation ("FBI"), a cooperating witness (the "CW") advised the defendant Pat Truglia that he needed to "clean" proceeds from his "shylocking" – loansharking – business, at which time Truglia volunteered to wash such proceeds for the CW.  See GX 301-Td ("I wanna get together with you, um, you know, what I talked about with you last night. PT: Yes. Not a problem. CW: Yeah, I gotta get that to you. So. PT: Okay. CW: Um. PT: You want, today? CW: Yeah, I gotta do it today. PT: Okay. Not a problem."); T. 818-823 (defense witness Nicholas Loprimo acknowledged that Truglia volunteered to write a check for Maragni).  At the time, the CW was a member of the

Honorable Frederic Block
June 16, 2014
Page 2

Colombo organized crime family of La Cosa Nostra (the "Colombo crime family") – and had previously held the position of captain within the crime family.

   On November 16, 2011, the CW provided Truglia with $40,000 in purported loansharking proceeds.  Truglia agreed to deposit the $40,000 into his bank account and send the CW a personal check in the amount of $40,000 by early December.  Truglia also agreed to assist the CW with future money laundering transactions of loansharking proceeds.  The following is an excerpt of that consensually-recorded conversation, which was admitted at trial:

  PT: What's going on?

  CW: Nothing. I wanna do this 'cause I got an appointment, I gotta take care of this.  Now listen, I spoke to, I was with [Colombo family member] Tommy [Farese].

  PT: Okay.

  CW: Alright. He knows I'm doing this with you, so.

  PT: Okay, great. Listen, um, you want me to give you, uh, I'll sign a whole bunch of checks for you?

  CW: No, no, no.

  PT: Okay. Okay. I'm just saying you could take it out when you want to take it out.

  CW: No.

  PT: Okay.

  CW: [UI] is fine. What I want to do is, um, what I want to do is, you know, you got a put it in like 8,000.

  PT: Yeah, yes.

  CW: You can't, you know.

Honorable Frederic Block
June 16, 2014
Page 3

    PT:  Not a problem. Yeah, I gotcha.

    CW:  You can't, every deposit's gotta be 8,000.

    PT:  No. I put, I, I, sometimes I put in 4,000, sometimes I put in 5, sometimes I put in 2.

    CW:  But you know, it, it's gotta be this 40,000 here.

    PT:  Right.

    CW:  It's gotta be, you know, by December 1st. I gotta have the check.

    PT:  Okay.

    CW:  So, you know. Just so you know what I'm doing.

    PT:  What's today?

    CW:  Today is the 16th.

    PT:  Okay, good. Alright so, are you coming back on the 1st?

    CW:  No.

    PT:  Okay.

    CW:  No.

    PT:  Do you want me to give you checks tomorrow?

    CW:  No, we're gonna mail the check up, um.

    PT:  Whatever. You just let me know. Do I make out one check? Or do I make out multiple?

    CW:  You can make out one check. You can make out one check.

    PT:  Okay.

Honorable Frederic Block
June 16, 2014
Page 4

> CW: As long as the money's in the bank.
>
> PT: Yeah.
>
> CW: You know. 'Cause what I'm gonna do is, you know, we'll legitimize it. I'm gonna take it out, you know.
>
> PT: Good.
>
> CW: And I'll write a check against it or something.
>
> PT: Okay.
>
> CW: Just make sure you don't, you know, don't juggle the money.
>
> PT: No, no, no. I got 12,000 in there now.
>
> CW: I'm just saying. Don't, don't, listen.
>
> PT: I'm good. You don't have to ask me that.
>
> CW: Tommy will go, Tommy will go fuckin' crazy.
>
> PT: You don't have to ask me that, Ren, you know that.
>
> CW: He says, "Ren." I says, "listen I, you know, I trust Patsy."
>
> PT: Absolutely. No, Ren, you don't have to ask me that. We're good.
>
> CW: Okay. It's like, I don't know. I might be getting, you know, shylock money – I might be getting more.
>
> PT: Okay. Whatever you need, I'm there for you.

(GX 300-Te at 2-4).

On November 30, 2011, Truglia and the CW spoke over the telephone. (GX 301-Te). During that telephone call, the CW provided Truglia with a street address in Staten Island and the correct spelling of the CW's name. (GX 301-Te). The following conversation then ensued:

Honorable Frederic Block
June 16, 2014
Page 5

      PT:   Alright, um. Let me ask you a question. Should I put, um. Inside, should I make it like, uh, like three, like three of 'em?

      CW:  No, you really don't have to. You don't have to.

      PT:   Okay. You got it.

      CW:  One is fine, one is fine. Because I'm just gonna deposit it, that's all.

      PT:   Okay, you got it, partner.

      CW:  Okay?

      PT:   Okay, you got it. I will, uh, I will get, I will get this out tomorrow.

      CW:  Yeah, and if, if you can, maybe FedEx it to me so I'll, you know, I'll be able to get it right away.

      PT:  Of course. [Chuckles] My friend, we got that covered.

(GX 301-Te).

      On December 1, 2011, Truglia sent, by FedEx, an envelope to the address in Staten Island, New York, that the CW had provided to Truglia during the November 30, 2011 telephone call.  (T. 343-345; GX 201B).  That envelope was delivered to the address in Staten Island at 7:48 a.m. on December 2, 2011.  (Id.)  On the morning of December 2, 2011, between 10:00 a.m. and 11:00 a.m., the CW provided to agents of the FBI a FedEx envelope addressed to the CW's residence in Staten Island, New York, containing a check in the amount of $40,000.  (T. 146-48; GX 208).  The check inside the envelope was dated December 1, 2011, drawn from an account in Truglia's name and made out to the CW.  (T. 149-50; GX 209; T. 655; GX 200B).

      On December 11, 2011, the CW and Truglia discussed, in substance, additional loansharking proceeds that the CW needed Truglia to launder in the same manner "as the last time," referring to the previous $40,000 transaction.  (GX 302-Ta).  Truglia agreed to launder the additional loansharking proceeds.  (Id.)  Later that day, the CW met

Honorable Frederic Block
June 16, 2014
Page 6

with Thomas Farese, who at the time held the position of the consigliere of the Colombo crime family. During this meeting, Farese inquired as to whether Truglia had successfully completed the $40,000 transaction. (GX 302-Tb). The CW told Farese that Truglia had done "a good job" and informed Farese that he intended to provide Truglia with additional loansharking proceeds to "clean," to which Farese responded, "Alright." (Id.) Later that evening, the CW provided Truglia with $7,000 in purported loansharking proceeds. Truglia agreed to deposit the $7,000 in his bank account and provide the CW with a check for $7,000 the next day, which in fact occurred on December 12, 2011. (GX 302-Tc, T. 765-72, GX 210).

Significantly, on June 8, 2011 in Florida, the CW openly discussed his loansharking business with Truglia and his brother, Anthony Truglia. For example, on June 8, 2011, the CW met with the defendant Truglia and his brother, Anthony Truglia, and among other things, asked the Truglias about an individual named "Iggy," who purportedly owed approximately $10,000 to the CW.

> AT: Go on, do they owe you money?
>
> CW: Yeah, yeah I need to find out where I can reach them and try to, you know, try to collect some money.

(GX 303-T). After Anthony Truglia agreed to locate one of Iggy's associates, "Paulie" or "Scottie," to assist the CW in collecting the unpaid debt from Iggy, Anthony Truglia then inquired, in the presence of Pat Truglia:

> AT: What, what do I go from there? What do you want me to do?
>
> CW: Well find out.
>
> AT: Where he's at?
>
> CW: Tell Paulie to find out, you know. They, there, there's like, there's money there, that they gotta
>
> AT: Do you wanna go there?

Honorable Frederic Block
June 16, 2014
Page 7

CW: Do I want to go there?

AT: Yeah.

CW: No, I don't think it's a good idea for me to go anywhere.

AT: Okay.

CW: But if I have to, I will.

AT: How do you want to do it.

CW: The next time I come in, I will go there.

AT: Well, I'll go with you.

PT: Absolutely.

AT: I got no problem going with you.

CW: Okay, so this is what we'll do. Uh, find out from Paulie or Scottie where the place is. And when I come in,

AT: We'll go.

CW: We'll go.

AT: We'll just sneak there.

CW: Alright.

AT: I'll go, we'll go in.

CW: I'm probably gonna have to come back down in July for a PET scan.

AT: Because they're not going to the cops or nothing, they're, they're, they're good people. I mean not that way, I mean, kinda, I mean yeah.

Honorable Frederic Block
June 16, 2014
Page 8

>CW: As long as he didn't go to the fucking cops you know, let them go where they want.
>
>AT: So I will. Okay.

(Id. at 7-8). Later, in the June 8, 2011 meeting, the CW asked the Truglias about another individual who owed the CW money:

>CW: Anybody see Frankie Tapp? No I don't hear a Frankie Tapp.
>
>AT: Nope, never once has he called us back.
>
>PT: Well I haven't seen him in years.
>
>CW: Hmm?
>
>AT: He owes us all money.
>
>PT: I haven't seen him in years.
>
>CW: Yeah he owes us all money, I'm trying to reach him.

(Id.)  These recordings proved that information regarding the CW's loansharking business was relayed to Truglia, thus clearly establishing Truglia's knowledge that the "shylocking" proceeds he was later asked to "clean" were illicit funds.

## DISCUSSION

The government respectfully submits that, in this case, a sentence within the advisory Guidelines range is appropriate in light of all relevant factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

I.  Legal Standard

The Sentencing Guidelines are advisory, not mandatory.  United States v. Booker, 543 U.S. 220, 258-60 (2005).  However, the Supreme Court held in Booker that

Honorable Frederic Block
June 16, 2014
Page 9

sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

II.     A Sentence Within the Guidelines Range Is Appropriate In This Case

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range is appropriate in this case, and a more lenient sentence is not warranted.

   A.     The Nature and Circumstances of the Offense

The defendant has been convicted of money laundering. While money laundering is always a serious crime that warrants a serious punishment, 18 U.S.C. § 3553(a)(1), the defendant's conduct is particularly serious given that he believed he was laundering the proceeds of racketeering activity earned by a member of the Colombo crime family and with the approval of the consigliere of the crime family, Thomas Farese.

The Colombo crime family is a dangerous criminal enterprise that uses violence, including murder, to further its interests. The defendant's criminal association with the Colombo crime family reflects his commitment to its violent goals and enabled him to commit racketeering activity in addition to the conduct for which he was charged.

In light of the foregoing, the government respectfully submits that the nature and circumstances of the offenses warrant a sentence within the advisory Guidelines range.

Honorable Frederic Block
June 16, 2014
Page 10

### B. The Defendant's History and Characteristics

The defendant's history and characteristics reveal that the conduct that forms the basis for the defendant's instant conviction was hardly an isolated act. Rather, he has committed a series of prior crimes, including money laundering. The defendant previously pleaded guilty to (1) one count of racketeering, in violation of Fla. Stat. § 895.03 (1993); (2) one count of conducting financial transactions involving proceeds of unlawful activity, in violation of Fla. Stat. § 896.101(2)(a)(1993); and two counts of grand theft, in violation of Fla. Stat. § 812.014(2)(c) (1993), and was sentenced on August 29, 1995 to a term of two years' imprisonment, followed by five years' probation for these crimes. Truglia thereafter violated the terms of his Florida probation by, inter alia, committing additional crimes. Specifically, the defendant violated his probation by "participat[ing] with others through an organization called Financial First in Atlanta, whose purpose and effect was to defraud investors by fraudulently soliciting investments for an international exchange market." Ltr. of Elizabeth A. Geddes and Nadia Shihata to the Court, dated Nov. 26, 2012 (Docket Entry No. 76). As a result of this probation violation, the defendant pleaded guilty to three counts of grand theft, in violation of Fla. Stat. § 812.014(2)(c)(1999). Id. In addition, while on pretrial release in this case, the defendant was arrested for driving under the influence of alcohol.

Thus, the defendant's history and circumstances also favor a sentence within the Guidelines range, and not a more lenient sentence. 18 U.S.C. § 3553(a)(1).

### C. Reflecting the Seriousness of the Offenses, Promoting Respect for the Law and Providing Just Punishment

A sentence within the advisory Guidelines range is necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offense is a serious crime that is critical to the success of organized crime families and that merits a serious punishment. A sentence below the advisory Guidelines range would therefore be insufficient to serve these important purposes of sentencing.

Honorable Frederic Block
June 16, 2014
Page 11

    D.    <u>Affording Deterrence and Protecting the Public</u>

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." <u>United States v. Davis</u>, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

    1.    <u>Specific Deterrence</u>

In this case, specific deterrence is critical. As set forth above, the defendant is an associate of the Colombo crime family. The government respectfully submits that despite numerous claims to the contrary at sentencing proceedings, aside from those who decide to cooperate against members of the mafia (and therefore are not permitted to maintain a connection to the mafia upon disclosure of their cooperation), few if any members or associates of the mafia give up their connections to the mafia even after serving significant terms of imprisonment. Furthermore, unlike many criminals, recidivism for individuals involved in the mafia does not decline with age, but if anything only increases with age, because a dedicated mafia associate can become inducted into his crime family and increase in rank and influence. The government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(C).

    2.    <u>General Deterrence</u>

In addition, a sentence within the advisory Guidelines range is necessary to deter others who are in a position to choose between a law-abiding life and a life of crime. At a July 2009 sentencing of a Colombo crime family captain, the Honorable Jack B. Weinstein imposed a sentence of 120 months, significantly above the Guidelines range of 63 to 78 months, and observed the following:

> I believe that under these circumstances, ten years is a sentence that is appropriate, not too long, not too great, and anything less would not send a message. The people, the youngsters in this

> city have to understand that they cannot join this organization
> and that when they do they destroy their lives.

United States v. Uvino, 07 CR 725 (JBW). Although in this case the government is seeking a sentence well under ten years' imprisonment, the government respectfully submits that a sentence within the Guidelines range is necessary to deter others from committing crimes and from getting involved in organized crime in the first instance. As Judge Weinstein highlighted, a sentence taking into account general deterrence is essential to send a message to young men . . . of the consequences of joining the mafia and to deter them from associating with it in the first place.

IV.     The Court Should Impose A Fine

The Court should impose a fine in this case. Under the statute, the maximum fine the Court can impose is $250,000, and the fine range pursuant to the Guidelines is $5,000 to $50,000. In this case, given the financial gain that the defendant earned as a result of his activities on behalf of the Colombo crime family, a fine is warranted.

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence within the Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a). Therefore, and for all of the foregoing reasons, the government respectfully submits that the Court should impose a sentence within the advisory Guidelines range of 24 to 30 months.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:     /S
Elizabeth A. Geddes
Nadia Shihata
Assistant U.S. Attorneys

cc:     Barry Schulman, Esq. (by ECF)